**NATIONAL ASSOCIATION OF MOTOR BUS OWNERS and American Trucking Associations, Inc., Petitioners,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,**

American Telephone and Telegraph Company et al., Intervenors.

Nos. 666, 667, Dockets 71–2119, 71–2120.

United States Court of Appeals, Second Circuit.

Argued May 2, 1972.

Decided May 24, 1972.

Richard P. Taylor, Washington, D. C. (Steptoe & Johnson, Washington D. C., of counsel), for petitioner National Assn. of Motor Bus Owners.

Arthur Blooston, Washington, D. C. (Jeremiah Courtney, Washington, D. C., of counsel), for petitioner American Trucking Assns., Inc.

Jon H. Marple, Counsel, F. C. C., Washington, D. C. (John W. Pettit, Gen. Counsel, Joseph A. Marino, Associate Gen. Counsel, F. C. C., Washington, D. C., Walker B. Comegys, Acting Asst. Atty. Gen., George Edelstein, Atty., Dept. of Justice, Washington, D. C., of counsel), for respondent Federal Communications Comm.

Hugh B. Cox, Washington, D. C. (E. Edward Bruce, Washington, D. C., C. Duane Aldrich, New York City, of counsel), for intervenors American Telephone and Telegraph Co. and Associated Bell System Companies.

Melvin Richter, Washington, D. C. (Jack Werner, Washington, D. C., Richard C. Hostetler, New York City, of counsel), for intervenor Western Union Telegraph Co.

Before KAUFMAN, MANSFIELD and TIMBERS, Circuit Judges.

MANSFIELD, Circuit Judge:

The principal question raised by these petitions for review is whether the Federal Communications Commission ("FCC") has complied with the mandate issued by this Court pursuant to our decision in American Telephone & Telegraph Co. v. FCC, 449 F.2d 439 (2d Cir. 1971), reversing an FCC order which had directed the carriers (American Telephone and Telegraph Company, Associated Bell System Companies and Western Union Telegraph Company) to offer a type of lower-rate, private-line bulk communications service known as "Telpak" on terms that would permit customers without limitation to share the service by combining their needs to meet the minimum bulk use level. We hold that the FCC's order on remand was not in conflict with our mandate and was within the Commission's administrative discretion. Accordingly we affirm the Commission's orders.

Since the essential facts are fully set forth in our earlier decision, *supra*, we here confine ourselves to the highlights. Beginning in 1961, AT&T initiated Telpak service, which "provides a customer with a means of continuous communication between specified locations without the carrier having to establish connections for each call or message, that is to say, without having to go through the usual call-and-hook-up process. Such service is not limited to conventional telephone apparatus; it also includes, at long or short distances, reproduction of documents and photographs, data transmission, remote metering, signaling and other highly sophisticated communica-

tions services." 449 F.2d at 442. In an effort to meet competition from point-to-point microwave communications systems, AT&T "allowed certain private-line users, whose communications requirements were not large enough to qualify them for Telpak on their own, to combine their needs and thus to become eligible to receive the benefit of the Telpak rates." 449 F.2d at 443. "Telpak sharing," however, was limited to those users—common carriers, pipeline companies, other public utilities, and federal, state and local governmental units—who were permitted by the FCC to share private microwave communications systems and were thus most likely to use such facilities unless they were offered a more economical alternative.

In July, 1966, the FCC amended its private microwave rules to allow greater sharing of private microwave systems. Acting on an informal complaint filed by businesses which were excluded from Telpak sharing, the Commission inquired whether AT&T intended to revise its Telpak sharing rules to take into account the new private microwave sharing regulations. When AT&T responded that it had no intention of adopting any changes, the Commission began proceedings under §§ 201(b) and 202(a) of the Communications Act of 1934, 48 Stat. 1070, 47 U.S.C. §§ 201(b), 202(a) (the "Act"), to determine whether limited Telpak sharing was unjust or unreasonable or whether it was unduly discriminatory.[1] After protracted hearings, the Chief of the Common Carrier Bureau of the FCC issued a recommended decision in which he concluded that the limited Telpak sharing provisions were unreasonably discriminatory but recommended that no prescription be made under 47 U.S.C. § 205(a) and that AT&T instead be ordered merely to remove the discrimination. 23 F.C.C.2d 639, 658 (1969).

On review the FCC agreed with its Bureau Chief that limited Telpak sharing was unlawfully discriminatory, but rejected his recommendation that no prescription be made. Instead, the Commission ordered the carriers (AT&T and WU) to file new tariffs providing for unlimited Telpak sharing. 23 F.C.C.2d 606, 624 (1970). The carriers then sought review in this Court. On the discrimination issue, we agreed with the FCC that AT&T's limited Telpak sharing rules were unlawful, since the discrimination was not justified as a response to private microwave competition. However, we also held that the Commission had improperly ordered the carriers to provide unlimited Telpak sharing, since § 205(a) only allows the FCC, after full opportunity for a hearing, to prescribe carrier rates or practices upon a finding that such rates will be "just and reasonable" and practices will be "just, fair and reasonable," and no such hearing had been held nor had findings been made.[2] Since the prescription order

1. The statutory sections provide:
   Section 201(b):
   "All charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful . . . ."
   Section 202(a):
   "It shall be unlawful for any common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service, directly or indirectly, by any means or device, or to make or give any un-

   due or unreasonable preference or advantage to any particular person, class of persons, or locality, or to subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage."

2. Section 205(a) provides:
   "Whenever, after full opportunity for hearing, upon a complaint or under an order for investigation and hearing made by the Commission on its own initiative, the Commission shall be of opinion that any charge, classification, regulation, or practice of any carrier or carriers is or will be in violation of any of the provisions of this chapter, the Commission is authorized and empowered to determine and prescribe

failed to comply with § 205(a), we remanded "the case to the F.C.C. for further proceedings to determine what remedy for the existing discriminatory sharing practices would be just, fair, and reasonable and as to what rates resulting therefrom would be just and reasonable." 449 F.2d at 453. Speaking for the Court, Judge Lumbard emphasized that it was passing no judgment on what would be a proper remedy, but was merely remanding because of the Commission's failure to comply with the procedural requirements of § 205(a).

In September, 1971, the Commission issued its decision and order on remand, in which it construed our mandate, as was its duty, Epstein v. Goldstein, 110 F.2d 747, 748 (2d Cir. 1940); Sherwin v. Welch, 115 U.S.App.D.C. 328, 319 F. 2d 729 (1963). It stated:

"We construe the Court's decision to mean that, if, under the circumstances of this case, the Commission desires to prescribe the specific course of action that the carriers must take in eliminating the unlawful discrimination, the Commission shall conduct further proceedings to develop a fuller evidentiary record upon which to base such prescription. On the other hand, if the Commission should decide that the carriers ought to be required to eliminate the unlawful discrimination without being subjected to an order by the Commission prescribing the specific measures to be followed, no further proceedings are necessary." 31 F.C.C.2d 674, 675 (1971).

The Commission was faced with the prospect that if it continued to employ the first of the alternatives available (prescription) there would be a long delay occasioned by the necessity of holding evidentiary hearings and making findings pursuant to § 205(a) before a final order could be entered, during which period the limited Telpak sharing provisions, already found to be unlawfully discriminatory, would continue in effect. Use of the second alternative, on the other hand, would promptly eliminate the discriminatory limited sharing arrangements but would also allow the carriers to eliminate sharing altogether, as they had often indicated they would do. Prior to our decision, *supra*, the Commission had expressed the view that elimination of sharing would only serve to increase the existing discrimination by giving certain classes of single large users (e. g., conglomerates, stock exchanges, electric power companies, and the Federal Government) substantial rate discounts that would not be available to smaller users of identical services, see 23 F.C.C.2d 606, 621–622 (1970), with the result that existing sharers would be harmed without any offsetting benefit to non-sharers in the absence of a rate decrease. As we pointed out earlier, however, the Commission's assumption that elimination of all sharing would be unlawfully discriminatory was unwarranted in the absence of evidentiary hearings and findings. "If Telpak without sharing unlawfully discriminates between bulk users and small users, then the overall Telpak rate structure is unlawful, for the essence of Telpak is a reduced rate limited to large volume users." 449 F.2d at 452.

In the interest of speed, therefore, the Commission decided not to prescribe a remedy but rather to order the carriers to file tariff revisions within 30 days eliminating the unlawful discrimination found to exist in the limited Telpak

what will be the just and reasonable charge or the maximum or minimum, or maximum and minimum, charge or charges to be thereafter observed, and what classification, regulation, or practice is or will be just, fair, and reasonable, to be thereafter followed, and to make an order that the carrier or carriers shall cease and desist from such violation to the extent that the

Commission finds that the same does or will exist, and shall not thereafter publish, demand, or collect any charge other than the charge so prescribed, or in excess of the maximum or less than the minimum so prescribed, as the case may be, and shall adopt the classification and shall conform to and observe the regulation or practice so prescribed."

sharing provisions. On October 1 AT&T notified the FCC that effective December 12 it was changing its tariffs "so as to eliminate the sharing provisions which the Commission has found to be unlawfully discriminatory." National Association of Motor Bus Owners ("NAMBO"), American Trucking Associations, Inc. ("ATA"), and the Association of American Railroads ("AAR") thereupon filed motions for a stay and petitions for reconsideration of the Commission's September Order on Remand, which were denied on December 3, 1971. 32 F.C.C.2d 619 (1971). Petitioners then sought this judicial review of the Commission's September and December orders.

■ Petitioners' initial contention is that the FCC misconstrued this Court's mandate by allowing itself the choice of prescribing a remedy pursuant to further proceedings or of letting the carriers correct the discrimination by themselves without further proceedings. They claim that our decision required the FCC on remand to prescribe a remedy for the unlawful Telpak discrimination after further proceedings. We disagree.

■ Petitioners concede, as they must, that in each case in which unlawful discrimination has been found, it is within the Commission's sole discretion either to prescribe a remedy pursuant to § 205(a) of the Act or to order, pursuant to the broad authority conferred on it by other provisions of the Act, that the carriers themselves end the discrimination, e. g., §§ 4(i) and 403, 47 U.S.C. §§ 154(i) and 403. See New York v. United States, 331 U.S. 284, 340–341, 67 S.Ct. 1207, 91 L.Ed. 1492 (1947). The language of § 205 does not mandate prescription; it merely authorizes and empowers the FCC to prescribe fair and reasonable charges or practices when existing charges or practices are found to be unlawful. The choice of prescription *vel non* is entirely one for the agency, not the courts. When the FCC does

elect to prescribe a remedy, however, it must comply with the appropriate statutory provision, § 205(a), and must make the requisite statutory findings of justness and reasonableness. It was this failure to comply, and not the underlying choice initially to prescribe, that was our concern in American Telephone & Telegraph Co. v. FCC, *supra*. Our function is merely to keep the Commission within its statutory bounds, not to make determinations reserved by Congress to the agency.

Our mandate did not compel the Commission to exercise its prescription authority rather than its discretionary power to direct the carriers to end the unlawful discrimination without prescription. Nor did any of the parties then argue that if the Commission's prescription of unlimited sharing should be invalidated the FCC would be precluded or estopped from exercise of the alternative course available to it. Indeed the issue was never raised. The mandate, therefore, required nothing more of the FCC than compliance with the procedural requirements of § 205(a). In referring to a "hearing and determination," the Court merely assumed that upon reconsideration the Commission, having started down the prescription path, would not retrace its steps to use some other available route. However, the Court did not foreclose the Commission from doing so.

We can conceive of no reason, and the petitioners have supplied us with none, why the FCC's use of its discretionary power to direct carriers to end a discriminatory practice should be terminated by a court decision invalidating its prescription of a remedy. There is nothing inconsistent between the action of the court in declaring invalid the FCC's use of prescription and the Commission's later decision to choose a different method of enforcement. Furthermore, such a construction of our mandate would raise serious problems of judicial usurpation. Justice Frankfurter long ago set forth the guiding principle

for judicial review of administrative action:

"On review the court may thus correct errors of law and on remand the Commission is bound to act upon the correction . . . . But an administrative determination in which is embedded a legal question open to judicial review does not impliedly foreclose the administrative agency, after its error has been corrected, from enforcing the legislative policy committed to its charge." FCC v. Pottsville Broadcasting Co., 309 U.S. 134, 145, 60 S.Ct. 437, 442, 84 L.Ed. 656 (1940).

"[T]he function of the reviewing court," Justice Douglas has noted, "ends when an error of law is laid bare. At that point the matter once more goes to the Commission for reconsideration." FPC v. Idaho Power Co., 344 U.S. 17, 20, 73 S.Ct. 85, 87, 97 L.Ed. 15 (1952). See also United States v. Saskatchewan Minerals, 385 U.S. 94, 95, 87 S.Ct. 254, 17 L.Ed.2d 192 (1966); FTC v. Morton Salt Co., 334 U.S. 37, 55, 68 S.Ct. 822, 92 L.Ed. 1196 (1948). Having decided that the FCC had failed to find that unlimited Telpak sharing was fair, just, and reasonable, as the statute required, our only course was to remand to the Commission for a re-exercise of its discretion.

■ Petitioners further suggest that, even if the decision of the FCC to defer to the carriers in the selection of a remedy to end Telpak sharing discrimination was not in violation of our mandate, such a course of action in this case was tantamount to a prescription of the elimination of all sharing, since AT&T had long made it known to the Commission that it would adopt that practice at its first opportunity. It is undisputed that AT&T had publicly stated its preference for ending all Telpak sharing. Indeed, it had notified the Commission at the initial Telpak hearing in 1970 that it would eliminate all Telpak sharing if the FCC were to adopt its Common Carrier Bureau Chief's recommended decision (i. e., no prescription). 23 F.C.C.2d 606, 621 (1970). Nevertheless, even were we to assume that the FCC knew to a certainty what AT&T would do if given a free hand, we do not believe that such agency deference in these circumstances amounted to a prescription within the meaning of § 205(a).

■ In general it is not the province of the courts to inquire into the *bona fides* of agency action or to label administrative determinations a facade. We do not say that in no circumstances would we find the Commission's order to the carriers to be a prescription within § 205(a), but only that this is far from such a case. The petitioners' principal reliance on Moss v. CAB, *infra*, merely emphasizes by comparison the weakness of their argument.

In *Moss*, the CAB decided that airline revenues had fallen so low that a fare increase was warranted. However, instead of holding a public hearing pursuant to a determination of what new rates were proper, the Board, after *ex parte* meetings with airline officials, issued a detailed formula for computing new rates and told the carriers that it would "consider fares produced by the formula as a 'just and reasonable' ceiling, and any fare in excess of this ceiling would be viewed *prima facie* as outside the realm of justness and reasonableness and would ordinarily be suspended and ordered investigated." The Court of Appeals held that in substance the CAB's action amounted to ratemaking. Speaking for the Court, Judge Wright commented:

"As a practical matter, the Board's order amounted to the prescription of rates because, as the Board admits, the pressures on the carriers to file rates conforming exactly with the Board's formula were great, if not actually irresistible. All the carriers had indicated an urgent need for an

immediate increase in revenues; the Board had made it clear, by threatening to use its power to suspend proposed rates, that only rates conforming to its detailed model would be accepted and not suspended . . . . Any carrier wanting to file higher tariffs would be dissuaded, not only by the indications in the order that only those tariffs meeting the standards set down by the Board would be accepted, but also by the Board's explicit statement that increases would be considered only 'where strong justification was shown.'" 430 F.2d 891 at 897.

In *Moss,* therefore, the airlines' "discretion" was so circumscribed as to have been almost nonexistent. The situation was not such that the airlines in fact had an option to choose between alternatives. Texas & Pacific Ry. Co. v. United States, 289 U.S. 627, 650, 53 S.Ct. 768, 77 L.Ed. 1410 (1933). By contrast, though the Commission here knew the carriers' preference, it did not preclude them from selecting an alternative to the elimination of sharing, such as unlimited sharing[3] or limited sharing enlarged to include a wide range of businesses. Moreover, in *Moss* the CAB had said that any rates other than those derived from its formula would be considered *prima facie* unreasonable, whereas here the FCC had already gone on record as stating that the elimination of all Telpak sharing—the alternative AT&T had previously favored—would *not* be fair, just, or reasonable. 23 F.C.C.2d 606, 622 (1970). Under such circumstances we can hardly conclude that the Commission's action amounted to a prescription of no sharing.

We note in addition that since the CAB in *Moss* had concluded that rates arrived at via its formula would be considered just and reasonable, it would have been fruitless for anyone to have challenged the rates before the Board. In this case, however, since the Commission has already previously stated that the elimination of all Telpak sharing would be discriminatory, petitioners have the door open to challenge AT&T's new tariff under § 202(a), which allows the Commission to void carrier charges or practices found to be unlawfully discriminatory.[4]

■ Finally, we reject the balance of petitioners' contentions as without merit. The petitioners claim that the FCC has "magnified the unlawful discrimination found to exist" by allowing the carriers to abolish all Telpak sharing for them while permitting their competitors, the airline industry, to share Telpak facilities under a separate tariff. AT&T Tariff, F.C.C. No. 260, ¶ 2.2.1 provides that air carriers may be treated as a single customer through "an aeronautical communications company licensed under the Aviation Services rules of the Commission to operate stations in the aeronautical mobile and fixed services." NAMBO and ATA may well be correct in alleging unlawful discrimination under these conditions. It seems to us, however, that their remedy lies in challenging ¶ 2.2.1 before the Commission,[5]

3. As we stated earlier, 449 F.2d at 453, the Commission's failure to make findings that unlimited sharing would be fair and reasonable does not imply that an evidentiary basis could not be adduced for such findings.

4. See n. 1, *supra.* While our previous opinion labelled as unwarranted the FCC's assumption that elimination of all Telpak sharing would be discriminatory, we rested on the absence of adequate Commission findings to support its conclusion, 449 F.2d at 452, not on a record disproving the conclusion.

5. A challenge to the tariff is presently before the FCC.

rather than in the reinstatement of the shared Telpak provisions which the Common Carrier Bureau Chief, the FCC, and this Court have all found to be unlawful.

We recognize that the issues posed by Telpak to the Commission and to the public are difficult and of vital economic importance. See American Trucking Associations, Inc. v. FCC, 126 U.S.App. D.C. 236, 377 F.2d 121 (1966), cert. denied, 386 U.S. 943, 87 S.Ct. 973, 17 L. Ed.2d 874 (1967). The elimination of Telpak sharing will undoubtedly cause a substantial increase in rates to certain small users of bulk communications circuits, such as motor carriers, which availed themselves of sharing while it was in effect. The inescapable fact, however, is that since limited sharing has been found to be unlawfully discriminatory after a full evidentiary hearing —a finding affirmed by us on appeal— no justification exists for its continued existence pending the formulation of a non-discriminatory alternative. The quest for the latter has been handicapped by premature statements (without benefit of evidentiary hearings, either through prescription under § 205 or challenge under § 202) characterizing at least one of the alternatives as unjustly discriminatory. The matter is further complicated by the fact that the fairness and reasonableness of existing Telpak rates, including their compensatory nature, is presently before a hearing examiner in Docket No. 18128. Under these circumstances the public interest would best be served by a speedy determination of the type of Telpak service that would be upheld as non-discriminatory. We feel confident that in the event of an attack upon the present Telpak tariffs under § 202(a) the Commission will expedite hearing and determination of these issues, which have now been the subject of proceedings for almost a decade.

Affirmed.